**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

SIKORSKY INTERNATIONAL
OPERATIONS, INC.,
    *Plaintiff/Counterclaim Defendant,*

    v.

BABCOCK MISSION CRITICAL
SERVICES LIMITED,
    *Defendant/Counterclaim Plaintiff.*

No. 3:19-cv-833 (OAW)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**THIS ACTION** arises from a contractual dispute between Plaintiff / Counterclaim-Defendant Sikorsky International Operations, Inc. ("Sikorsky") and Defendant / Counterclaim-Plaintiff Babcock Mission Critical Services Limited ("Babcock"). The court has reviewed the complete record, including all evidence adduced at a bench trial before the undersigned, and is thoroughly apprised in the premises. The court's determinations are as follows.

## I.    FACTUAL BACKGROUND[1]

This is a case for determination of damages. Few facts are genuinely in dispute. Rather, it is the import and effect of agreed-upon events that is at issue. The court therefore first recounts the parties' history with one another.[2]

---

[1] The court will cite primarily to the parties' proposed findings of fact for ease of review, but incorporates by reference each underlying citation to the record.

[2] Additional factual details, particularly as to the parties' internal actions and actions with third parties, will be added as necessary in the substantive discussion.

### A. <u>2011-2016</u>

In December 2011, Sikorsky was engaged[3] to manufacture and sell sixteen S-92 helicopters[4] over a period of years (the "Agreement").  ECF No. 111-1 ¶ 3—4; ECF No. 232-1 at 9 ¶ 11.  Per the Agreement, and according to Sikorsky's usual practice, each helicopter would be manufactured in two phases: first, each helicopter would be built to "baseline" specifications (for which there is no independent end use), and then it would be customized to meet additional specified needs during the "completion phase."  ECF No. 111-1 ¶ 5; ECF No. 232-1 at 12 ¶ 26.  Delivery of each helicopter (and transfer of title) would occur upon completion of the baseline phase, but Sikorsky would retain possession of the aircraft through completion of certain specifications based upon its intended use.[5]  EXF No. 111-1 ¶ 4; ECF No. 232-1 at 12 ¶ 27.

Per the Agreement, should Babcock be unwilling or unable to make any payments, Sikorsky could terminate[6] the Agreement by written notice, upon which Sikorsky would incur no further obligation, and Babcock would reimburse Sikorsky for its termination

---

[3] Babcock was not a signatory to the original contract, but it subsequently assumed all the buyer's rights and obligations thereunder.  ECF No. 111-1 ¶ 6.  There is no dispute on this point, and so the court will not refer to the actual buyer herein.

[4] The S-92 is a "heavy-lift" helicopter large enough to accommodate up to 19 passengers.  ECF No. 232-1 at 8 ¶ 4.  It can be built for service in several capacities, including search-and-rescue, transport for the oil and gas industry, or for travel by heads of state.  *Id.*

[5] The S-92 can be built to accommodate various needs, such as to transport workers to offshore oil rigs (the "oil and gas" configuration), for private use by executives or potentates, and for search and rescue.  ECF No. 232-1 ¶ 4.

[6] Construction of the Agreement is governed by Connecticut law, ECF No. 111-1 ¶ 8, and Connecticut has adopted the Uniform Commercial Code ("UCC"), which defines a "termination" as the dissolution of a contract for a reason other than breach, and a "cancellation" as the dissolution of a contract due to a breach.  Conn. Gen. Stat. § 42a-2-106(3)—(4).  But the Agreement also explicitly states that the words used therein should be given their plain English meaning, ECF No. 60-3 § VII.8, and English as commonly spoken generally does not distinguish these terms in this way.  Moreover, dissolution by Sikorsky because Babcock refused to pay would be a dissolution due to breach, or a "cancellation" by UCC terms, but the Agreement clearly characterizes the dissolution as a "termination."  *Id.* § VII.4.  Accordingly, the court finds that the distinction between these terms was not incorporated into the Agreement, and thus will disregard those two UCC definitions.  The terms "termination" and "cancellation" are used synonymously herein to refer to dissolution generally, regardless of the cause.

2

costs and expenses.  ECF No. 60-3 § VII.4.  If Babcock already had paid more than the total of such termination costs and expenses, any surplus would be refunded to Babcock. *Id.*

The Agreement specified intermittent payment and build deadlines, ECF No. 111-1 ¶ 5, but allowed for renegotiation of delivery schedules, payment schedules, and even the price of each helicopter (to adjust for future economic conditions), ECF No. 232-1 at 9—10 ¶ 11—12.  Over the years, the agreement was amended over a dozen times, often due to Babcock's requests for deferrals.  ECF No. 232-1 at 15 ¶ 36.  In Fall 2015, for example, Babcock executive Andrea Cicero sought to "freeze" the last four helicopters Babcock contracted to purchase ("Helicopters 13, 14, 15, and 16," respectively), appealing to Sikorsky's "partnership spirit."  Bab. Tr. Ex. 7.  He even flew to meet with Sikorsky executive Nathalie Previte in person to discuss the deferral because Babcock had "absolutely nowhere to go" with them.  ECF No. 232-1 at 16—17 ¶¶ 40—41.

After several months of negotiations, *see* Bab. Tr. Exs.[7] 5, 8, 11—12, 14 (showing ongoing emails between the parties regarding the specifics of the deferral arrangement); *see also* ECF No. 243 at 69:7—9, the parties agreed to defer delivery on all four helicopters,[8] with delivery of Helicopters 15 and 16 in baseline form to occur in October 2018.  ECF No 111-1 ¶ 10.  Given that Mr. Cicero represented that Babcock still was committed to honoring the Agreement, ECF No. 243 at 172:9—12, Sikorsky also agreed to allocate as little of Babcock's payments as possible to Helicopters 15 and 16, thereby

---

[7] The court will cite to Babcock's and Sikorsky's trial exhibits as "Bab. Tr. Ex." and "Sik. Tr. Ex.," respectively.
[8] At some point, Sikorsky also agreed to store Helicopters 13 and 14 after Babcock formally had taken delivery of them, because Babcock had no immediate use for them.  ECF No. 234 at 7 ¶ 27.  In May 2018, though, Babcock made an urgent request to move that aircraft into operations very quickly.  ECF No. 232-1 at 36 ¶ 103.

continuing cash flow to Sikorsky, but devoting those funds to the helicopters that already were in production, ECF No. 232-1 at 65 ¶ 197; ECF No. 234 at 6 ¶ 22.   An amendment memorializing these adjustments to the Agreement was executed in 2016.  ECF No. 232-1 at 17—18 ¶ 43; ECF No. 234 at 6 ¶ 24.  The balance due on Helicopters 15 and 16 would be due upon delivery in October 2018.  ECF No. 111-1 ¶ 13.

The first fourteen helicopters were manufactured, delivered, and paid for without issue and in accordance with the Agreement, as amended.  ECF No. 111-1 ¶ 9.

### B. <u>Winter 2017-2018</u>

The next year, though, according to Mr. Cicero's trial testimony, he repeatedly gave Mr. Sharp verbal notice that, as to Helicopters 15 and 16, it would be "effectively impossible" for Babcock to "take delivery of those aircraft."  ECF No. 234 at 7 ¶¶ 28—29. He clarified on direct examination that when he referred to Babcock not taking delivery, he meant that Babcock could not take delivery at all.  ECF No. 243 at 70:11—15.

According to Mr. Cicero, Mr. Sharp eventually told him that a request for any relief other than a pure deferral would have to be escalated to another Sikorsky executive, Dana Fiatarone.  ECF No. 234 at 7 ¶ 29.  So, Mr. Cicero flew to Connecticut to meet with Mr. Fiatarone, Mr. Sharp, and Ms. Previte on November 2, 2017 (the "2017 Meeting"), purportedly to tell them that Babcock would not take delivery of Helicopters 15 and 16. ECF No. 234 at 6—7 ¶¶ 30—31.  It is undisputed that those present discussed other ways to continue the partnership, including identifying other industries Babcock served for which Sikorsky might have been able to supply aircraft, suggesting other customers to whom Babcock might have been able to lease Helicopters 15 and 16, and replacing some of the older aircraft in Babcock's fleet with a newer Sikorsky model.  ECF No. 232-1 ¶ 50;

4

ECF No. 234 at 10—11 ¶¶ 39 and 43.  Mr. Cicero even sent Mr. Sharp the composition of the Babcock fleet the day after the 2017 Meeting.  ECF No. 234 at 10 ¶ 40.

And according to Mr. Cicero, he also told Mr. Fiatarone[9] in person at the 2017 Meeting that Babcock could not take delivery of Helicopters 15 and 16.  ECF No. 234 at 8 ¶¶ 32—33.  Mr. Cicero cannot remember if he used the word "cancel" or any variation thereof (and no other witness recalls him using the term).  ECF No. 234 at 8 ¶ 33.  But he testified during trial that he did not recall asking for a mere deferral.  ECF No. 243 at 77:14—15.  He also told Mr. Fiatarone, though, that Babcock would be "happy to explore alternative avenue of revenues for Sikorsky" to make up for the money lost on Helicopters 15 and 16.  ECF No. 234 at 9 ¶ 38.  He asserts that this was the context for the various other topics of discussion: finding other business opportunities for their partnership to ease the "pain" of cancelling Helicopters 15 and 16.  ECF No. 243 at 77:15—21.

But Mr. Fiatarone and Mr. Sharp[10] remember the 2017 Meeting quite differently.  They recall discussing deferring delivery of Helicopters 15 and 16, but also exploring various means of still realizing the revenue that Sikorsky was expecting in 2018, and this desire to fill the revenue gap was the reason for the other topics discussed.  ECF No. 232-1 at 19—20 ¶ 48.

There is no documentary evidence of what actually was said at the 2017 Meeting.  Mr. Cicero sent a follow-up email that thanked the Sikorsky executives for their

---

[9] Mr. Fiatarone recalls Mr. Sharp being present the entire meeting with Mr. Cicero.  ECF No. 235 at 90:24—25.  Mr. Cicero (who is the only attendee who remembers the repudiation) could not recall whether Mr. Sharp was present for the entire 2017 Meeting, and apparently only recalls Mr. Fiatarone being present for the repudiation.  ECF No. 243 at 74:6—75:8.

[10] Ms. Previte also does not remember Mr. Cicero repudiating the Agreement, but she admittedly was not present for most of the meeting.  ECF No. 236 at 45:10—21.

"partnership spirit," but it did not otherwise summarize what was discussed.  ECF No. 232-1 at 21 ¶ 50.b.

The executives remained in contact after the 2017 Meeting.  Through the early months of 2018, Mr. Sharp and Mr. Cicero continued to discuss Babcock's lack of a "home" for Helicopters 15 and 16.  ECF No. 234 at 12—13 ¶ 52.  Mr. Sharp emailed Mr. Cicero about a possible "way out" of delivering Helicopters 15 and 16 by swapping the S-92s for a different type of helicopter.  ECF No. 234 at 10 ¶¶ 41—42.  In January 2018, the parties executed another amendment to the Agreement that accounted for an alteration in configuration for all helicopters still to be delivered, including Helicopters 15 and 16, but explicitly left the Agreement otherwise intact.  ECF No. 232-1 at 24 ¶ 58; ECF No. 234 at 11—12 ¶¶ 46—48.  Similarly, a few weeks later, Babcock executive Emilio Sanchez signed a Completions Specification that also included Helicopters 15 and 16. ECF No. 232-1 at 25 ¶ 61; ECF No. 234 at 13 ¶¶ 53—55.

### C. Spring 2018

It is undisputed that on April 24, 2018, Mr. Cicero and Mr. Sharp met again in London, and this time Mr. Cicero explicitly said that he needed to cancel the Agreement. ECF No. 232-1 at26—27 ¶ 65; ECF No. 234 at 15 ¶¶ 60—61.  Mr. Sharp asked Mr. Cicero to put the request to cancel in an email, which Mr. Cicero did on May 3, 2018.  ECF No. 232-1 at 27 ¶ 66; ECF No. 234 at 15 ¶¶ 62.  Mr. Sharp informed his team on April 24, though, that Mr. Cicero would be sending formal notice that he intended to trigger the failure-to-pay provision.  ECF No. 234 at 15 ¶ 63.

Sikorsky did not immediately terminate the Agreement.  ECF No. 234 at 17 ¶  73. Instead, Sikorsky sent Babcock a formal letter stating its "strong preference" for both

parties to continue to perform as obligated under the Agreement.  ECF No. 232-1 at 28 ¶ 71; ECF No. 234 at 17 ¶¶ 71, 74.  Sikorsky also stated that it already had incurred significant costs with respect to Helicopters 15 and 16[11] and that cancellation was not a "practical solution" for Sikorsky.  ECF No. 232-1 at 27—28 ¶¶ 68, 71.

The parties continued to explore possible mutually-agreeable solutions.  At a May 2018 meeting, for example, Sikorsky executives met with Mr. Sanchez (who had taken over the relationship with Sikorsky pending Mr. Cicero's voluntary departure from the company, ECF No. 234 at 18 ¶ 75) and proposed several leasing arrangements Babcock might utilize.  ECF No. 232-1 at 28—29 ¶ 74; ECF No. 234 at 18 ¶ 78.  In June, the parties explored possibly completing Helicopters 15 and 16 for search-and-rescue instead.  ECF No. 232-1 at 29 ¶ 75.  Mr. Sharp suggested a factoring arrangement in a June 2018 email.  ECF No. 234 at 19 ¶ 81.  Mr. Sharp also tried to help Babcock find customers.  ECF No. 234 at 19—10 ¶ 84.  Throughout negotiations, Sikorsky continued to manufacture the helicopters to baseline.  ECF No. 232-1 at 32 ¶ 90.

Sikorsky notes certain indications their efforts were working.  On July 18, 2018, Mr. Sanchez sent Sikorsky an email stating that Babcock's best option was to "defer" the baselines and all financial commitments attached thereto.  ECF No. 232-1 at 29 ¶ 76; ECF No. 234 at 20—21 ¶ 87.   Then, on August 1, 2018, a Babcock employee asked a Sikorsky representative for a quote to install a particular fuel tank on Helicopter 15.  ECF No. 232-1 at 29 ¶ 78, ECF No. 242 at 21 ¶ 89.

---

[11] According to Sikorsky, taking into account the lead time necessary to procure all the parts for an S-92, it takes approximately 36 months to manufacture each such aircraft.  ECF No. 232-1 ¶ 25.  Consequently, decisions about how many helicopters to build are made years in advance.  *Id.*  Sikorsky also creates an annual build plan, which schedules the machines for assembly.  ECF No. 242 at 6 ¶ 23.

On August 20, 2018, Sikorsky rejected any offer of a no-commitment deferral and stated that it expected Babcock to honor its legal obligations under the Agreement.  ECF No. 232-1 ¶ 82; ECF No. 242 at 22 ¶¶ 92—93.  This included accepting and paying for Helicopters 15 and 16 in October 2018.  ECF No. 111-1 ¶ 17.

Babcock did not accept delivery of Helicopters 15 and 16 in October 2018.  ECF No. 232-1 at 30 ¶ 89.  Sikorsky brought suit for Babcock's breach of the Agreement, also alleging that Babcock acted in bad faith by negotiating deferred payments on aircraft it knew it would never accept or pay for.  *See generally* ECF No. 1.  Babcock countersued, alleging that Sikorsky violated the covenant of good faith and fair dealing by failing to mitigate its damages.  *See generally* ECF No. 23.  At bottom, the parties disagree as to when Babcock repudiated the contract, whether Sikorsky's conduct in response to that repudiation was commercially reasonable, and what damages, if any, should be awarded to Sikorsky.

## II.    RELEVANT LAW

The parties agree that this action is governed by Connecticut law, and in particular, Connecticut's enactment of the Uniform Commercial Code ("UCC").

Under those provisions, after one party repudiates a contract, the aggrieved party becomes entitled to remedies, but rather than pursue those remedies immediately, they may instead await performance by the repudiating party for a commercially reasonable time.  Conn. Gen. Stat. § 42a-2-610.

For a seller, remedies include reselling any undelivered goods. *Id.* § 42a-2-703(d). And if "the resale is made in good faith and in a commercially reasonable manner the

seller may recover the difference between the resale price and the contract price. . . but less expenses saved in consequence of the buyer's breach." *Id.* § 42a-2-706(1). Generally, in such situations, "the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price . . . but less expenses saved in consequence of the buyer's breach." However, if that remedy still does not make the seller whole, then damages may be calculated in the alternative as "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer," crediting any amount made from the resale. *Id*. § 42a-2-708(2). In any of these cases, the seller also may recover incidental damages," which include "any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." *Id.* § 42a-2-710.

In making itself whole, the seller may identify the goods that would have been delivered under the contract, even if those goods had not already been identified, "if at the time he learned of the breach they are in his possession or control," or the seller may resell "goods which have demonstrably been intended for the particular contract even though those goods are unfinished." *Id.* § 42a-2-704(1). Where commercially reasonable to avoid loss, the seller also may complete the manufacture of any unfinished goods. *Id.* § 42a-2-704(2). "[I]t is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach." *Id*. § 42a-2-706.

III.    **FINDINGS OF FACT**

There are three questions of fact upon which the court must make a finding.  The first question is when, specifically, Babcock repudiated the contract such that Sikorsky became obligated to mitigate its damages.[12] *Rowe v. Cormier*, 189 Conn. 371, 373 (1983) ("Whether the parties have manifested an intention to modify or abandon their agreement is ordinarily a question of fact.").  The second is whether Babcock acted in bad faith by not sooner telling Sikorsky that it would not accept or pay for Helicopters 15 and 16. *Renaissance Mgmt. Co. v. Connecticut Hous. Fin. Auth.*, 281 Conn. 227, 240, 915 A.2d 290, 298 (2007) ("Whether a party has acted in bad faith is a question of fact . . . .").  And the third is whether Sikorsky failed to made reasonable efforts to mitigate its damages after Babcock repudiated.  *Webster Bank, N.A. v. GFI Groton, LLC*, 157 Conn. App. 409, 424 (2015) ("What constitutes a reasonable effort [to mitigate damages] under the circumstances of a particular case is a question of fact for the trier . . . .") (quoting *Vanliner Ins. Co. v. Fay*, 98 Conn.App. 125, 145 (2006)).

A.  **Repudiation**

"[A]nticipatory repudiation centers upon an ***overt communication*** of intention or an action which renders performance impossible or ***demonstrates a clear determination not to continue with performance***." Conn. Gen. Stat. § 42a-2-610, cmt. 1 (emphasis added).    "The manifestation of intent not to render the agreed upon

---

[12] As a preliminary matter, the court posits that a definitive finding on this point is not strictly necessary to the resolution of this action.  Babcock now concedes that Sikorsky was reasonable to complete the manufacture of Helicopters 15 and 16.  And statute permitted Sikorsky to wait to see if Babcock would withdraw its repudiation.  Most importantly, though, there is nothing Sikorsky could have done in the way of mitigation between the date Babcock says it repudiated (November 2, 2017), and the date Sikorsky says Babcock repudiated (May 3, 2018).  Absent some opportunity to mitigate that Sikorsky failed to realize in the months between these dates, it does not appear to matter which argument prevails.  Nevertheless, the court makes a formal finding as to this question.

10

performance may be either verbal or non-verbal . . . ." *Andy's Oil Serv., Inc. v. Hobbs*, 125 Conn. App. 708, 722 (2010) (quoting *Koski v. Eyles*, 37 Conn.Supp. 861, 862–63 (1981)).

Babcock claims that Mr. Cicero repudiated the Agreement at the 2017 Meeting. Sikorsky disagrees, contending that repudiation occurred via the May 2018 email.

The court rejects the claims that Mr. Cicero's comments at the 2017 Meeting amounted to repudiation, as they were nearly identical to his comments in 2015 when he sought a mere deferral: that Babcock "couldn't take delivery of [Helicopters] 15 and 16." ECF No. 243 at 74:24—25.  This also mirrors comments to Mr. Sharp throughout 2017, *see id.* at 68:2—5 (stating that Helicopters "15 and 16 are effectively impossible for us to be delivered" and "[w]e cannot take delivery of those aircraft."), but Babcock does not argue that that any of *those* communications were repudiations.  If the first several times Mr. Cicero said these things was not intended to signal repudiation, it is not clear why the last time should have done so.  To the contrary, the court finds it most reasonable for the Sikorsky executives to have construed Mr. Cicero's assertions as notice that the aircraft could not be accepted *as then scheduled*, not that Babcock *never* would accept them, particularly given the parties' history of accommodating Babcock through deferrals.

Further, no other evidence shows that repudiation occurred at the 2017 Meeting. There are no meeting notes to that effect, *see* Sik. Tr. Ex. 55 ("I have found dates of meetings [Mr. Cicero] had with [Sikorsky] before he left but we can't find any meeting notes . . . . I would have expected . . . notes on [sic] after this meeting."), and Mr. Cicero's follow-up email thanked the Sikorsky executives for their "partnership spirit," which, without further context, does not suggest repudiation of a contractual obligation worth tens of millions of dollars.  Instead, this echoes his expression of gratitude years earlier

11

when Sikorsky worked with Babcock to defer Helicopters 13, 14, 15, and 16.  Bab. Tr. Exs. 7, 11 ("I want to express my gratitude on your availability to approach this situation as strong partners.").  Thus, the court finds that the follow-up email undercuts his position.

Mr. Cicero also pointed to the continued discussions he had with the Sikorsky executives regarding alternative partnership opportunities as proof of clear repudiation. He stated that he only entertained these discussions *in lieu* of Helicopters 15 and 16. ECF No. 243 at 89:12—20.  He questioned why he would have entertained other potential transactions with Sikorsky *in addition* to a contract for which he had no use.  *Id.* at 78:1—12.  But the Sikorsky executives plausibly answered that question: in order to fill the revenue gap a deferral would leave in Sikorsky's fiscal year.  ECF No 235 at 113:23—114:15; ECF No. 237 at 211:9—17.  Thus, these negotiations defy Mr. Cicero's claim.

Most significantly, though, as late as January 2018, Mr. Sanchez executed Amendment 16 to the Agreement, which included deliveries of Helicopters 15 and 16, and just a few weeks later, he signed a Completions Specification which also included those helicopters.  Although Mr. Sanchez, clearly realizing the apparent import of executing official documents that did not reflect his understanding of the Agreement, asked Mr. Cicero whether either document should be signed while they included the last two helicopters, he relied upon Mr. Cicero's conclusion that this was a mere formality. ECF No. 234 at 12—14 ¶¶ 49—51, 56—58. Thus, it appears that the beliefs of the other Babcock executives derived from Mr. Cicero's faulty conclusion as to what he had communicated at the 2017 Meeting, and therefore those beliefs are not probative.

Even Sikorsky's sophistication did not require it to act in anticipation of a Babcock breach in light of Cicero's hedging, for, "To use this inference of a probable future breach

12

as the equivalent of a present absolute, unequivocal renunciation of the contract, or refusal to abide by it, is plainly without justification." *Bronx Derrick & Tool Co. v. Porcupine Co.*, 117 Conn. 314, 167 (Conn. 1933) (quoting *Wells v. Hartford Manilla Co.*, 76 Conn. 27, 34 (Conn. 1903)).

For all of the aforementioned reasons, the court rejects the notion that repudiation occurred at the 2017 Meeting.

However, the court also cannot find that the repudiation occurred via the email sent May 3, 2018. While this was the first written notice of the breach, it is undisputed that on April 24, 2018, at a meeting in London, Mr. Cicero explicitly told Mr. Sharp that he needed to cancel the Agreement. That same day, Mr. Sharp informed the Sikorsky team that Babcock would not be paying for the last two helicopters. While Sikorsky appears to believe that repudiation only could have been accomplished in writing, there is nothing in the record to support that belief. In fact, per the Agreement, only *Sikorsky* had any obligation to provide written notice of termination. Absent any provision to the contrary, the general rule that repudiation can be effected via any (clear) method of communication applies. Thus, the court concludes that repudiation, as defined by the UCC, occurred via Mr. Cicero's verbal notice to Mr. Sharp on April 24, 2018.

### B. Bad Faith

Under Connecticut law, "[b]ad faith in general implies both 'actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.'" *Habetz v. Condon*, 224 Conn. 231, 237, (1992) (quoting Black's Law Dictionary (5th Ed.1979)). It is not shown through mere

13

negligence, but rather involves some "dishonest purpose." *Id., see also Geysen v. Securitas Sec. Servs. USA, Inc.,* 322 Conn. 385, 400 (2016) (noting that bad faith is "not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . ."). "[B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain. . . ." *Geysen,* 322 Conn. At 400 (quoting *Elm Street Builders, Inc. v. Enterprise Park Condominium Assn., Inc.*, 63 Conn.App. 657, 667 (2001)) (alterations in original).

Sikorsky alleges that Babcock's conduct between Fall 2015 and Spring 2018 shows bad faith insofar as Babcock intentionally induced Sikorsky to forego installment payments on Helicopters 15 and 16, while still keeping them in production, despite knowing since 2015 that it would not accept delivery of or pay for the last two aircraft.

However, the state of the market still left significant uncertainty as to Babcock's future needs, and so just as Sikorsky will not be held accountable for not acting earlier upon a foreseeable breach before Babcock's repudiation, the court will not find that Babcock met the legal standard for bad faith while engaging in repudiation-adjacent language and conduct which otherwise might impact a company's credibility in future dealings with its business partners.

Thus, the court finds in Babcock's favor on Sikorsky's claim of bad faith.

### C. Mitigation

The court now turns to Sikorsky's conduct after Babcock's repudiation. "A party being damaged has an obligation to make reasonable efforts to mitigate its damages. . . ." *Connecticut Light & Power Co. v. Westview Carlton Grp., LLC*, 108 Conn. App. 633, 642 (2008). To prevail on a claim of failure to mitigate, a litigant "must show that the injured

14

party failed to take reasonable action to lessen the damages; that the damages were in fact enhanced by such failure; and that the damages which could have been avoided can be measured with reasonable certainty." *United Concrete Prods., Inc. v. NJR Constr., LLC*, 207 Conn. App. 551, 567 (2021).  It is the breaching party's burden to show that the nonbreaching party failed to take reasonable steps to mitigate its damages following the breach.  *Webster Bank*, 157 Conn. App. at 424.

The parties agree that it was reasonable for Sikorsky to have continued the manufacture of Helicopters 15 and 16 to baseline, as is permitted under the UCC. Babcock argues, though, that Sikorsky failed to mitigate by (1) not terminating the Agreement after the repudiation, and (2) not selling the helicopters at the earliest opportunity to do so.  With respect to the latter argument, Babcock points to Sikorsky's reidentification of a different helicopter to the Agreement in August 2018 and several sale opportunities that arose before Sikorsky sold Helicopters 15 and 16 in October 2020 and August 2022, respectively).

In the first instance, Babcock's position rests upon a clear mischaracterization of Sikorsky's rights as Sikorsky's obligations.  Babcock points to Section 42a-2-610 of the General Statutes of Connecticut and the Agreement to support its position that Sikorsky was "required" to sell Helicopters 15 and 16 at the earliest opportunity, ECF No. 234 at 47 ¶ 34, but neither authority stands for that proposition.  The UCC clearly permits, but does not require, an aggrieved seller to resell goods after a buyer has repudiated, but it also expressly allows a seller "for a commercially reasonable time [to] await performance by the repudiating party . . . ."  Conn. Gen. Stat. § 42a-2-610.  Similarly, the Agreement provides that Sikorsky *may* elect to terminate upon a refusal of payment, but does not

mandate termination.   Therefore, Sikorsky's conduct in continuing to perform under the Agreement is completely consistent with both provisions, and Babcock is unable to carry its burden.  *United Concrete*, 207 Conn. App. at 567 ("The burden to prove the failure to mitigate damages rests with the breaching party.").

Moreover, the court finds that Sikorsky is a "lost volume seller" which had no duty to mitigate at all.  Where "a contract has been breached, if there is a factual finding that an 'injured party could and would have entered into the subsequent contract, even if the [underlying] contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract.'"  *Gianetti v. Norwalk Hosp.*, 266 Conn. 544, 552 (2012) (quoting 3 Restatement (Second), Contracts § 347, comment (f), p. 117 (1981)) (alteration in original).  "Resale does not reduce a lost volume seller's damages because the breach has still resulted in its losing one sale and a corresponding profit." *Id*. at 565 (quoting *R.E. Davis*, 826 F.2d at 682–83 n. 7 (internal quotation marks omitted).

A party qualifies as a lost volume seller where the evidence shows that a subsequent contract was "not a substitute for the one lost as a result of the breach."  *Id.* at 767.  A contract is a "substitute" for this purpose if the seller has entered it in place of the breached contract, and which the seller would not have been able to satisfy had there been no breach.  *Id.* Thus, there is a three-part test to determine whether a party is a lost volume seller: (1) the seller must have been able to perform the breached contract and the subsequent contract simultaneously; (2) the second contract must be profitable; and (3) the seller likely would have entered into the subsequent contract even absent any breached contract.  *Id.*

Sikorsky satisfies all three requirements.  It certainly was able to complete its performance under the Agreement and also satisfy its subsequent sales obligations.  Those subsequent sales were profitable (indeed, the August 2018 sale was so profitable that Babcock argues it eliminated Sikorsky's damages).  And Sikorsky clearly would have entered into those subsequent contracts even if Babcock had accepted delivery of Helicopters 15 and 16.  Thus, the court concludes that Sikorsky was a lost volume seller.

Babcock argues that Sikorsky has not shown its "unlimited access to goods," but Babcock presents no authority for the proposition that unlimited sales capacity is an essential element of the relevant inquiry.  It cites to dicta in *Integrated Cirs. Unlimited v. E.F. Johnson Co.*, 875 F.2d 1040, 1043 (2d Cir. 1989), wherein the United States Court of Appeals for the Second Circuit accepted the lower court's finding that a litigant was not a lost volume seller "given the limited supply" of the goods it sold, but the lower court's ruling never clearly concluded that the litigant was not a lost volume seller; it simply held that the litigant could not recover under damages provisions specific to such a seller. *Integrated Cirs. Unlimited, Inc. v. E.F. Johnson Co.*, 691 F. Supp. 630, 634 (E.D.N.Y. 1988), rev'd and vacated sub nom. *Integrated Cirs. Unlimited v. E.F. Johnson Co.*, 875 F.2d 1040 (2d Cir. 1989)).  Moreover, the "limited supply" in question was the supply of the relevant product (a specific microprocessor) *in the market* at the time of the sale, not the supply which the litigant had in stock.  The implication was that while there were few such microprocessors for sale during the relevant period, the litigant (who, importantly, was a *distributor* and *not* a manufacturer) would have been unable to obtain additional microprocessors sufficient to satisfy the breached contract and substitute sales.  Those circumstances clearly are quite different than those in the present case.  The only other

17

case Babcock specifically cites on this topic is *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.*, No. CIV.A.3:97CV894(CFD), 2002 WL 229900, at *12 (D. Conn. Feb. 4, 2002), wherein the district court found a dairy to be a lost volume seller although its "production capacity was not, in a strict sense, unlimited," because "it did have the capacity to enter into other supply agreements even if [the defendant] had not breached the [a]greement at issue . . . ."  Thus, Babcock's own citations support the court's conclusion that Sikorsky is a lost volume seller.  *See also Marcus Dairy, Inc. v. Rollin Dairy Corp.*, No. CIV.3:05CV589(PCD), 2008 WL 4425954, at *13 (D. Conn. Sept. 24, 2008) ("A merchant can be a lost volume seller even if its capacity is not unlimited, if it had the capacity to enter into another supply contract at the time of the breach.").

"[B]y definition, a lost volume seller cannot mitigate damages through resale." *Gianetti*, 266 Conn. at 565 (quoting *R.E. Davis*, 826 F.2d at 682–83 n. 7) (internal quotation marks omitted) (alteration in original).  Thus, because it is a lost volume seller, Sikorsky had no duty to mitigate its damages.  *See also Marcus Dairy, Inc.*, 2008 WL 4425954, at *13 ("'The majority of both courts and commentators have recognized the illegitimacy of the mitigation argument' as it pertains to lost volume sellers.") (quoting *New England Dairies*, 2002 WL 229900, at *12).  Babcock's argument that Sikorsky treated Helicopters 15 and 16 as merely part of its inventory after the breach is inconsequential, because Sikorsky was entitled to do precisely that.  Sikorsky's injury was not merely that Babcock failed to accept two helicopters; it was the loss of a buyer for two aircraft Sikorsky had put into production, and which never might have been made had Babcock not contracted for them.  Because Babcock breached, Sikorsky was left with two additional heavy machines during a time when buyers for those aircraft were few.  Had Sikorsky

18

simply identified Babcock's helicopters to the first two sales following repudiation, that still would have left it with two more helicopters in its inventory.  Conversely, had Babcock taken delivery of the helicopters, Sikorsky simply could have planned to build more should it have wished to increase its inventory.

Babcock next argues that Sikorsky is not a lost volume seller because (1) there was a parts shortage at the time of the breach, and (2) Sikorsky has closed the facility where it built the S-92s.  Neither argument is convincing.  As to the former, Babcock overstates the degree of the parts shortage.  It was not the case that there were none of the particular part (an aft quadrant) to be had in the market, but that Sikorsky simply had a finite number on hand in Fall 2018.[13]  They had enough to satisfy all their active contracts, though, and procured others in time to satisfy later contracts.  ECF No. 232-1 at 35 ¶ 104.  The shortage therefore did not affect Sikorsky's status as a lost volume seller.  And as to the latter argument, there is no requirement that a lost volume seller continue selling a particular product ad infinitum.  Anderson U.C.C. § 2-708:28 (3d. ed.) (noting that a seller who closes its business due to market collapse still may recover lost profits for the life of a repudiated contract, not only the period between the repudiation and the closure).  Businesses of course adjust their operations in response to market conditions, just as Babcock attempted to do, and while Sikorsky might have closed the facility where it previously built its S-92 helicopters, that does not mean it has stopped selling S-92s entirely.  Indeed, it sold Helicopter 16 after that facility closed, simply moving it to a different facility to prepare it for sale.  It is not even clear that Sikorsky finally has

---

[13] Sikorsky had enough aft quadrants for its manufacturing needs, but it also provides post-sale support to customers, and their after-market clients also needed aft quadrants, which created the so-called "shortage."  ECF No. 238 at 246:12—247:25.

sold all of the S-92s it had in its inventory at the time of the Babcock breach.  But even presuming (1) all the S-92s in its inventory have been sold, and (2) there are no plans to build any more S-92s, that still only means that absent Babcock's breach, Sikorsky might have had two more helicopter sales before that part of Sikorsky's business ceased. Therefore, these arguments also fail.

Finally, the court must address *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 997 (2d Cir. 1988), to which Babcock cites heavily and repeatedly to support its contention that Sikorsky acted in a commercially unreasonable manner.  In *Apex Oil*, two parties contracted for a sale of heating oil, but after approximately three-quarters of the oil had been delivered, the buyer rejected the balance (48,000 barrels).  The seller delivered the rejected barrels to a different buyer the next day, but then purported to identify a different 48,000 barrels to the breached contract six weeks later, when the price of heating oil had declined significantly.  The court found that the seller's delay was not commercially reasonable because the resale could not have accurately reflected the market value of the goods at the time they were rejected, and there was no justification for the delay.

*Apex Oil* is distinguishable from the case at bar for many reasons.  First, it did not deal with a lost volume seller.  Second, the goods involved (and the markets therefor) were completely dissimilar from those in the instant case.  Resale of barrels of heating oil at less than a dollar a gallon in New England in February is far different from the resale of two multimillion-dollar heavy-lift helicopters during a global economic downturn in the industry that has the most use for those aircraft.  And "[w]hat is . . . a reasonable time [for resale] depends upon the nature of the goods, the condition of the market and the other circumstances of the case; its length cannot be measured by any legal yardstick or divided

into degrees."  Conn. Gen. Stat. § 42a-2-706, cmt. 5.  The nature of the goods at issue, the poor market conditions, and Sikorsky's resale efforts in suboptimal conditions justify any delay in the resale of Helicopters 15 and 16.  And that is the key distinction between this case and *Apex Oil*, where the Second Circuit found no such justification.

And to be clear, the court finds that none of the actions cited by Babcock signal bad faith by Sikorsky, which was not obligated to terminate the Agreement immediately, either under the terms of the Agreement or under Connecticut law.  Consistent with relevant authority, Sikorsky sent Babcock a formal letter stating its "strong preference" for both parties to continue to perform as obligated under the Agreement and it attempted to help Babcock find opportunities for use of the helicopters.  The court finds this to be a commercially reasonable response to the anticipatory repudiation of goods worth tens of millions of dollars, particularly in the short term, and particularly given that Babcock had just had a quick change of course with respect to Helicopter 13 (which Sikorsky had been storing because Babcock had no client to use it) that same year.

Even in the long term, the record shows that Babcock gave Sikorsky hints that it might yet accept the helicopters.  Mr. Sanchez's July 20, 2018, email explicitly stated that Babcock's best option was *deferral.*  And while Mr. Sanchez testified at trial that he meant only that he wished to defer in order to have more time to negotiate an amicable cancellation, ECF No. 234 at 20—21 ¶ 87, that intention is not interpretable from the email itself.  The August 1, 2018, request for a quote to an alteration on Helicopter 15 also indicated a change of heart.  Babcock tries to mitigate the import of the request, too, noting that its author was not privy to the discussions being had higher up the chain of command, but that is beside the point.  Whether or not the author knew that cancellation

negotiations were ongoing, it is clear she knew of an opportunity Babcock was pursuing. Internal Babcock communications confirm as much. *See* Sik. Tr. Ex. 51 (stating that the request for a quote was "in reference to a potential opportunity . . . ."); Bab. Tr. Ex. 223 at 139:2–17 (stating that the quote was requested in relation to a request to bid on a particular contract). Thus, Sikorsky's hope that the Agreement may still culminate in complete performance on both sides not only was not misplaced, but well-founded.

Babcock next takes issue with Sikorsky's so-called "tail swap"[14] – its reallocation (from an August 2018 sale) of a helicopter which previously had been identified as destined for Babcock. While the helicopter with tail number 308 tentatively had been identified (or "soft-pegged") as Helicopter 15, Sikorsky reidentified tail number *307* to the Agreement in August 2018 and sold tail number 308 to another customer. ECF No. 234 at 38 ¶ 2. Babcock argues that these actions were commercially unreasonable because had Sikorsky not reidentified tail number 308 to a different contract, it would have wiped out its damages completely as to Helicopter 15 in the August 2018 sale.

Even setting aside that this argument is irrelevant in the lost volume context, the court still finds no impropriety in the tail swap. The court already has found that it was reasonable for Sikorsky to continue as if the Agreement might yet be performed. Thus, in August 2018, it still was operating such that it could satisfy both the Agreement and the additional sale it had made that month to a third party. Sikorsky presented competent evidence that to realize its contractual obligations to both customers (and after-market demands for aft quadrants), it had to allocate to each contract those aircraft which could be finished on time. Because the newer contract had a later delivery date than the

---

[14] The tail number of a helicopter is a number assigned by Sikorsky for identification purposes.

Agreement, Sikorsky reidentified the helicopters that could be completed by October 2018 as Helicopters 15 and 16.  ECF No. 238 at 247:19—249:10.  The court finds this to be commercially reasonable.  While the timing of the reidentification warrants some scrutiny, nothing else in the record suggests that the tail swap was nefarious, and the court finds that the timing adequately was justified with the reasons described herein.

Finally, Babcock points to several S-92s Sikorsky sold before selling Helicopters 15 and 16 (in October 2020 and August 2022, respectively).  Specifically, Babcock points to the sales of a single S-92 in August 2018, in September 2019, in October 2019, in November 2019, and in November 2020.

Again, setting aside the court's conclusion that Sikorsky was a lost volume seller, the court still finds that Sikorsky's actions were commercially reasonable.  Babcock's argument rests upon a characterization of the duty to mitigate that is so expansive as to render the duty tantamount to an obligation to Babcock to save it from the consequences of its own actions.  But this is a gross overstatement of the law.  "[T]he theoretical foundation for the plaintiff's duty to mitigate damages is that the defendant's negligence is not the proximate, or legal, cause of any damages that could have been avoided had the plaintiff taken reasonable steps to promote recovery and avoid aggravating the original injury." *Preston v. Keith*, 217 Conn. 12, 16 (1991) (citing *Morro v. Brockett*, 109 Conn. 87, 93—94 (1929)).  Even the phrase "duty to mitigate" has been described by some authorities as a misnomer, since a party incurs no liability for failure to mitigate; the party simply is not entitled to damages which might have been avoided.  *Id.* at 16 n.5; *see also* Restatement (Second) of Contracts § 350 (1981).  Thus, the doctrine stems from the principle that an aggrieved party must help *itself*, not that an aggrieved party must help

23

the breaching party.  This is entirely consistent with the UCC's express goal to make an aggrieved party whole after a breach.  *See Rametta v. Stella*, 214 Conn. 484, 492 (1990) ("The general rule of damages in a breach of contract action is that the award should place the injured party in the same position as he would have been in had the contract been performed."). Thus, Connecticut courts consistently have held that "[t]he duty to mitigate damages [does] not require the plaintiff to sacrifice any substantial right of its own or to exalt the interests of the [breaching party] above its own." *Danpar Assocs. v. Somersville Mills Sales Room, Inc.*, 182 Conn. 444, 446 (1980).  Persuasive authority describes the "duty" rather as a restriction on available damages to exclude amounts that "the injured party could have avoided *without undue risk, burden or humiliation.*" Restatement (Second) of Contracts § 350 (1981) (emphasis added).

Viewed through this paradigm, it is clear that Sikorsky's sales decisions do not fall afoul of its duty to mitigate.  As to the August 2018 sale, the court already has stated several times that it was reasonable after the April 2018 repudiation for Sikorsky to continue to act as though Babcock would accept the last two helicopters under the Agreement, and the court also has found that Sikorsky's allocation of helicopters in its inventory (including the tail swap) was reasonable.  Consequently, the August 2018 sale was not a "substitute" sale to begin with, and the court finds nothing suspect in Sikorsky staying its course and continuing the sale of tail number 308 to a third party even after Babcock declined to accept delivery of Helicopters 15 and 16 the month before.

The next sale of an S-92 helicopter did not occur until September 2019.  There, Sikorsky elected to sell a helicopter which was older than Helicopter 15 and 16 and that already had a Certificate of Airworthiness.  Sikorsky presented credible evidence that

24

some clients are uncomfortable taking a helicopter with such certification, and a helicopter declines in value the longer it has had its certificate.  Being presented with a customer willing to accept such an aircraft, Sikorsky used the opportunity to sell it.[15]  ECF No. 238 at 251:10—252:17, 66:15—69:6; ECF No. 238 at 81:20—82:10.

The October 2019 sale also presented issues for Sikorsky to consider when identifying a helicopter to the contract.  The customer in that sale was willing to accept a more expensive baseline helicopter, allowing Sikorsky to sell an aircraft which had cost more to build than Helicopters 15 and 16.  ECF No. 239 at 81:5—16.  Babcock elicited testimony that Sikorsky had quoted this customer a *lower* baseline price than it quoted other customers, *id.* at 96:4—100:24, but the court is not persuaded that this indicates anything improper, particularly where there is no other evidence of how those contract negotiations progressed, and where Babcock's own proposed findings of fact concedes that the ultimate baseline price was, in fact, several million dollars higher than that of the sale the previous month.  ECF No. 234 at 31—32 ¶¶ 130, 137.

Sikorsky sold another S-92 in November 2019 and one in November 2020, each time declining to allocate Helicopter 15 or 16 to the sale.[16]  ECF No. 238 at 90:17—91:1.  Sikorsky conceded that the Babcock helicopters already were soft-pegged to sales pursuits which appeared promising at the time.  ECF No. 238 at 57:13—18, 102:16—18.  In one case, draft agreements had been exchanged, but negotiations stalled with the advent of the global pandemic.  ECF No. at 236:177—178:3.[17]  As to these sales, it is

---

[15] Babcock notes that there is no documentary evidence of this customer's comfort with the certificate of airworthiness, but the court finds the testimony presented on the topic to be sufficient and credible.

[16] Helicopter 15 was sold in October 2020, so it was not available for the November 2020 sale.

[17] Babcock attempts to shoehorn certain testimony into an admission that Sikorsky planned not to use either Helicopter 15 or 16 for certain pursuits, but the testimony actually given was that Sikorsky did not plan to sell Helicopters 15 and 16 to these customers *because it did intend to sell them to another customer*. ECF No. 242 at 215:14—23.

important to remember that Sikorsky itself had nothing to gain by allocating Helicopter 15 and 16 to these pursuits because regardless of which helicopter went to any of these sales, Sikorsky still would have the same number of helicopters left in its inventory and on its books (and two more than it anticipated having due to Babcock's breach).  Choosing not to sell Helicopter 15 and 16 earlier did not aggravate Sikorsky's injury, and Sikorsky was entitled to allocate to each sale the aircraft which would spare it further losses and which would best serve its own interests.[18]

Furthermore, Babcock completely ignores Sikorsky's efforts to mitigate damages. Helicopters 15 and 16 were built to baseline, but no further, thereby rendering them available for completion to configurations other than oil-and-gas, which was perhaps particularly reasonable during a global pandemic, when "VIP" or "head of state" configurations might have been expected to fare better due to market characteristics at that time.  *See, e.g.,* Tim Levin, *Why sales of high-priced Bentleys and Rolls-Royces have boomed while the auto industry suffered*, BUSINESS INSIDER, Jan. 29, 2022, https://www.businessinsider.com/rolls-royce-car-sales-boom-2021-pandemic-bentley-rolls-royce-2022-1; *see also* Rupert Neate, *Super-rich jet off to disaster bunkers amid coronavirus outbreak*, THE GUARDIAN, Mar. 11, 2020, https://www.theguardian.com/world/2020/mar/11/disease-dodging-worried-wealthy-jet-off-to-disaster-bunkers.  Sikorsky also refrained from immediately procuring a Certificate of Airworthiness on Helicopters 15 and 16, thereby preserving their value for a longer period of time.  ECF No. 238 at 252:16—

---

[18] Of course, this analysis would be altered if Sikorsky were not a lost volume seller and if these sales were substitute sales, but the court need not and does not decide whether these sales decisions would be commercially reasonable under those circumstances.

252:17.  And most importantly, as discussed above, throughout the period after Babcock refused delivery, Sikorsky soft-pegged Helicopters 15 and 16 to other potential sales.

In summary, the court concludes that Sikorsky did not act in bad faith by failing to mitigate its damages because as a lost volume seller, it did not have such a duty, and furthermore, Sikorsky's actions do not otherwise show bad faith.  Accordingly, the court concludes that Sikorsky is entitled to judgment on Babcock's counterclaim.

## IV.   CONCLUSION OF LAW: DAMAGES

As a technical matter, damages generally are a question of fact, but the basis upon which damages are to be calculated is a question of law.  *Mystic Oil Co., Inc. v. Shaukat, LLC*, 228 Conn. App. 147, 153 (2024).  Here, however, the basis for damages is the predominating issue, and the legal conclusion thereon will all but decide the total amount to be awarded, and so the court characterizes the question as one of law.

"It is axiomatic that the burden of proving damages is on the party claiming them." *Expressway Assocs. II v. Friendly Ice Cream Corp. of Connecticut*, 218 Conn. 474, 476 (1991).  "Proof of damages 'should be established with reasonable certainty and not speculatively and problematically.'"  *Leisure Resort Tech., Inc. v. Trading Cove Assocs.*, 277 Conn. 21, 35 (2006) (quoting *Johnson v. Flammia*, 169 Conn. 491, 500 (1975)). "Damages 'are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.'"  *Id.* at 477 (quoting *Humphrys v. Beach*, 149 Conn. 14, 21 (1961)).

Of course, where a written contract is available, the assessment of parties' rights begins there.  Here, the Agreement contains a failure-to-pay provision, which grants

27

Sikorsky a right to its "termination costs and expenses" in the event Babcock fails to make any payment when it comes due.  Unfortunately, the Agreement does not then define what comprises "termination costs and expenses."  Thus, the contract is of little help here. Therefore, the court turns to Connecticut law to construe the phrase, as required by the Agreement.  Because Connecticut has adopted the UCC, the court finds those provisions to be controlling.  The UCC also does not define "termination costs and expenses," but it does lay out clear provisions governing those remedies available to an aggrieved party where its counterpart breaches a contract.  The court finds those to be the applicable provisions here.

Sikorsky seeks damages on Helicopters 15 and 16 (which it ultimately sold in October 2020 and August 2022, respectively) pursuant to the provision allowing for damages after resale, Conn. Gen. Stat. § 42a-2-706.[19]  Under that section, a seller may resell any undelivered goods and recover the difference between the resale price and the original contract price, plus incidental damages.

With respect to Helicopter 15, Sikorsky calculates its total damages to be $8,668,817.00.  To arrive at this number, Sikorsky first estimated the cost of the baseline helicopter under the resale contract ($23,475,346.00), and then subtracted that number from the price of the helicopter under the Agreement ($30,086,830.00).  Sikorsky then added the cost of completions materials that Sikorsky was unable to repurpose for use in another project ($751,931.00), and credited the amount Babcock already had paid before

---

[19] Sikorsky actually cites to Conn. Gen. Stat. § 42a-2-709 for its damages on Helicopter 16, which allows for purchase price damages.  Section 709, though, requires that where goods are resold before judgment enters, the net proceeds must be credited to the breaching buyer.  This credit renders the damages calculation under Section 709 the same as that under Section 706.  Thus, at bottom, the damages Sikorsky seeks on both helicopters is the same: the difference between the resale price and the contract price, plus incidental damages.  The court therefore refers only to Section 706 herein.

the breach ($1,538,305.00).  Finally, Sikorsky calculated what that sum would be worth at the time Sikorsky actually received payment from the resale buyer (thereby compensating for the cost of the delay in receipt of payment after October 2018).

With respect to Helicopter 16, Sikorsky calculates its total damages to be $7,631,373.00.  To arrive at this number, Sikorsky credited against the helicopter price under the Agreement ($30,086,830.00) the amount Babcock had paid before the breach ($1,538,305.00), then calculated the difference between that sum and the price of a baseline helicopter from the resale contract ($39,990,000.00).  This yielded a surplusage in excess of $11,000,000.00.  From that, though, Sikorsky deducted its costs in completing Helicopter 16 to the resale specifications ($9,551,027.00) and the cost of any completions materials purchased for Helicopter 16 that could not be repurposed ($949,668).  Because the resale of Helicopter included an ancillary sale of the original engine as a spare (and replacement with a newer engine), Sikorsky also credited Babcock with the gain on that sale ($121,759).  Finally, Sikorsky calculated what the payments under the resale contract were worth in October 2018 (at the time of the breach), and added the difference (again, thereby compensating for the cost of the delay in receipt of payment).

Sikorsky seeks its lost profits only in the alternative, if the court finds it should not award Section 706 damages.  But under the UCC, lost profits are generally what volume sellers are to be awarded.  Conn. Gen. Stat. § 708(2).  The court is thus presented with the initial question of whether a lost volume seller may recover Section 706 resale damages.  Sikorsky has not presented, nor has the court found, any authority answering this question in the affirmative.  But there is nothing in the UCC that precludes lost volume

sellers from seeking this remedy.  To the contrary, the UCC explicitly provides an aggrieved seller with a menu of remedies to choose from, and lost profits and resale damages both are available as seller's remedies where a buyer refuses delivery or fails to make a payment.  Conn. Gen. Stat. § 42a-2-703.  Caselaw similarly does not limit a seller's remedies under the UCC.  *See Trans World Metals, Inc. v. Southwire Co.*, 769 F.2d 902, 908 (2d Cir. 1985) (declining to extend state law to limit remedies under the UCC where the federal court sits in diversity); *accord R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 683 (7th Cir. 1987) (concluding that "a reselling seller . . . is free to reject the damage formula prescribed in 2–706 and choose to proceed under 2–708."); *cf. Nobs Chem., U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 215 (5th Cir. 1980) (declining to permit damages that would place the seller in a better position than performance would have placed it).

However, the court need not answer this question here because, even assuming that resale damages may be awarded to a lost volume seller, the court finds this remedy inappropriate in this case.

### A. Resale Damages

First, with respect to Helicopter 15, Sikorsky has not satisfied the court that its assumptions are correct.  The resale of Helicopter 15 was not structured like the Agreement, with different prices for the baseline helicopter versus completions services.  Rather, it charged a single price for the helicopter completed to the requisite specifications[20].  Sikorsky has retroactively calculated the relative cost of the baseline helicopter and the completions services and determined that the cost of the aircraft itself

---

[20] There also were additional parts and services included in the contract, but those are not relevant here.

was evenly split between the baseline helicopter and the completions services, so it divided the price approximately in half to estimate the relative cost of the baseline alone for purposes of making the damages calculation.  But Babcock elicited testimony from Sikorsky's expert at trial that under the Agreement, Sikorsky would only profit from the sale of the baseline, and actually would take a slight loss on the completion services for Helicopter 15.  ECF No. 241 at 100:24—103:1.  So the very first assumption Sikorsky took in assessing its resale damages skews the calculus slightly in its own favor.

Of greater significance, though, are the damages Sikorsky seeks for the delay in payment on both aircraft.  In essence, Sikorsky asks that its damages award account for the difference in the value of money between October 2018, when it ought to have been paid, and when it was actually paid under the resale contracts, which both provided for intermittent payments between 2020 and 2025.[21]  This accounting is effected by inflating the difference between the resale and contract prices using Treasury yields.  But Sikorsky has not provided, and the court has not found, any authority allowing for recovery for delay in payment.  Even the UCC's definition of "incidental damages" does not include adjustments for inflation.  The UCC does allow a *buyer* of goods to recover for expenses incident to a delay in performance by a *seller*, Conn. Gen. Stat. § 42a-2-715(1), but even there, the provision conceives of expenses the buyer must incur to effect cover, for example, not the cost of delay of payment.

Moreover, the claim for damages caused by delay appears to be duplicative of Sikorsky's request for pre- and post-judgment interest, which explicitly *is* permitted under both federal and state law.  *See* Conn. Gen. Stat. § 37-3a; 28 U.S.C.A. § 1961.

---

[21] The court acknowledges that even Sikorsky's updated filing treats the payments on the resale contracts as if they still are forthcoming, although they ought to have been completed or nearly completed by 2025.

31

Connecticut courts have noted that the main purpose of the award of prejudgment interest is "to compensate parties that have been deprived of the use of their money." *Kennynick, LLC v. Standard Petroleum Co.*, 222 Conn. App. 234, 259 (2023) (quoting *Sosin v. Sosin*, 300 Conn. 205, 230 (2011)). This appears to also be the injury Sikorsky seeks to address through its inflated damages calculations. In fact, the federal statute calculates interest using Treasury yields, which also is how Sikorsky calculates its delay damages.

The court acknowledges that calculating resale value without accounting for the time value of money (and the market value of S-92 helicopters) results in a comparatively imperfect total predicated upon a fiscal fiction that inflation does not exist. But this merely underscores why lost profits are the appropriate remedy for a lost volume seller generally, and most particularly in this case, where the seller did not resell the goods for several years, and where the goods were very expensive to begin with, both of which factors cause Sikorsky's total resale damages to grow exponentially. Generally, the time value of money is not at issue in resale damages because resales generally do not occur so long after a breach. But here, the circumstances of the resale have an unusually strong effect on the total resale damages.

For all these reasons, Sikorsky has failed to carry its burden of showing the court that resale damages are appropriately awarded here.

### B. Lost Profits

As a lost volume seller, though, the court concludes that Sikorsky is entitled to its lost profits. Babcock disagrees, asserting that Sikorsky "bargained away" that right in the Agreement. Whereas an unexecuted draft version of the Agreement contained Sikorsky's boilerplate language that in the event of a customer's refusal to pay amounts due,

32

Sikorsky would be entitled to its termination costs and expenses *and a reasonable allowance for profits*, that language does not appear in the final version of the Agreement.

There is no evidence in the record that shows what discussion was had prior to the omission, if any, or why the provision was dropped from the final Agreement.[22]  The only reference to any contract negotiations is an email from a Sikorsky sales manager stating that the draft "incorporate[d] the commercial changes [the parties] discussed, as well as almost all of the legal changes" the buyer requested.  Bab. Tr. Ex. 1.

Absent any indication of the parties' intention in omitting Sikorsky's contractual entitlement to a reasonable allowance for profits, the court is unwilling to give it the weight Babcock wishes.  In the first instance, the Agreement does not explicitly state that "termination costs and expenses" were to be Sikorsky's exclusive remedy, which, per the UCC, means it was optional.  Conn. Gen. Stat. § 42a-2-719 ("[R]esort to a remedy as provided [in a contract] is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.").  Moreover, though, the complete abandonment of an entire remedy to which a party otherwise would have been entitled by function of law is not the sort of thing one would expect to be done with so little care, nor is it the sort of thing one would characterize as merely "commercial" (which the court interprets to mean dealing with the terms of sale specifically, such a price and delivery) or "legal" (which the court interprets to mean attending to terms either technically necessary or redundant as a matter of law).  To read the omission as an alteration of Sikorsky's rights under the contract is too substantive an alteration to read into the contract on such scant evidence.

---

[22] Here, it is important to recall that Babcock was not even a part of these contract negotiations.  Babcock only later assumed the rights and responsibilities of the actual buyer.  Thus, Babcock has no particular insight into the import of these contract negotiations.

It seems more likely to the court that the term was deleted as redundant, since the UCC would determine Sikorsky's entitlement to lost profits, and Babcock did not want to give Sikorsky the entitlement as a matter of right.  But not being automatically entitled to a remedy is not the same as being unentitled to it.  This argument therefore is rejected.[23]

Babcock next argues that Sikorsky has failed to show that it is entitled to lost profits under the UCC.  By statute, lost profits are recoverable only where the seller would not be made whole by an award of damages equal to the difference between the market price at the time and place of breach and the contract price.  Conn. Gen. Stat. § 42a-2-708(1).

But "[o]ne of the categories of sellers entitled to damages under § 2–708(2) is the lost volume seller."  *New England Dairies*, 2002 WL 229900 at *11 (quoting 1 James J. White & Robert S. Summers, Uniform Commercial Code § 7–9 (4th ed.)).  And even Babcock concedes that lost profits under Section 708(2) are appropriate "when a manufacturer produces goods to order for a breaching buyer and substitute buyers are unlikely to be found."  ECF No. 242 at 48 ¶ 40 (quoting 4 R. Anderson, *Anderson on the Uniform Commercial Code* U.C.C. § 2-708:21 (3d. ed. 1983)) (internal quotation marks omitted).  That is exactly the scenario presented here.  Sikorsky, a manufacturer, built Helicopters 15 and 16 to order for Babcock, a breaching buyer, at a time when substitute buyers were scarce due to the economic downturn in the oil and gas industry, and at least

---

[23] Again, the court posits that resolution of this specific issue is unnecessary for the ultimate disposal of this case, given the preceding analysis, in which the court determined that absent a definition in the Agreement of "termination costs and expenses," reversion to the UCC is demanded.  One could imagine instances where omission of "lost profits" from the termination provision might have had stronger effect, for example if Babcock had signaled its intention to cease performing under the Agreement in 2015 (when it already was considering repudiating Helicopters 15 and 16), before Sikorsky had ordered all the parts and begun assembly of the aircraft.  In that case, that the term as altered might limit Sikorsky's recovery to only the cost of those parts it had already bought, as those, hypothetically, might be its only "termination costs and expenses" in those circumstances.  But that is not the situation presented here.

during a portion of the pandemic, even the wealthy customers who otherwise might have sought VIP or "head of state" configurations had fewer events to attend in which they might have want to be seen in, or to have hosted guests in, a luxury aircraft.  It was that downturn that drove Babcock to repudiate the Agreement in the first instance.  Indeed, Sikorsky points out that at the time of Babcock's breach, it had ten helicopters either completed or in production (including the two Babcock refused to accept), only six of which it had sold by the time the case went to trial over three years later.

Moreover, the court finds a damages calculation under Section 708(1) to be unworkable, and if not unworkable then clearly insufficient to compensate Sikorsky for its injury.  The determination of "market value" is itself an initial quagmire.  Babcock refused delivery of an S-92 helicopter completed to baseline in October 2018, but completions services were to be performed over the next several months.  So the court first would have to determine whether it is the market value of a *baseline* or of a *completed* helicopter which is relevant, and also at what point in time.

Even were the court to make these determinations, it is unclear what was the market value of a baseline S-92 helicopter in October 2018, or of a completed S-92 helicopter configured for use in the oil-and-gas industry in April 2019 (when Helicopters 15 and 16 were to have been completed) because there was no market for S-92 helicopters, generally.  Babcock did arrange for an appraisal which concluded that in October 2018, a single baseline S-92 had a value of $24,510,000.00, and an S-92 helicopter in an oil-and-gas configuration had a value of $27,140,000.00.  But Babcock ignores its own appraisal, pointing instead to the November 2018 delivery of an S-92 to another customer, which sale it asserts fixes the market value at $31,500,000.00.  But

35

that contract price was negotiated in August 2018, not November 2018, and while the August 2018 market value of an S-92 might be a satisfactory approximation of the relevant market value, it is not clear why the court should ignore the information Babcock itself undertook to procure.

Regardless of which figure the court determines is the correct one, no calculation under Section 708(1) would place Sikorsky in the same position it would have been in had Babcock performed, which, ultimately, is the end goal.  Therefore, the court concludes that the fairest measure of Sikorsky's damages is simply what it anticipated earning as profit off of Helicopters 15 and 16 under the Agreement, less payments Babcock already made.

### C. Incidental Damages

Section 708 allows for recovery of incidental damages, which includes "any commercially reasonable charges, expenses or commissions incurred . . . in connection with return or resale of the goods or otherwise resulting from the breach."  Conn. Gen. Stat. § 42a-2-710.  With respect to each relevant helicopter, Sikorsky includes in its incidental damages the value of completions material that it was unable to repurpose. And with respect to Helicopter 16, it also includes costs it incurred updating the aircraft.

Because the lost profits award compensates Sikorsky as if Babcock had paid for and accepted a completed S-92, the court finds that awarding the cost of unused completions materials would result in a double recovery for completions services. Accordingly, the court concludes that Sikorsky has failed to show it is entitled to incidental damages on Helicopter 15.

36

Next, with respect to Helicopter 16, the court is not convinced that Sikorsky ought to recover the costs it incurred updating and replacing parts that had become obsolete. Strictly speaking, refitting Helicopter 16 for resale does qualify as "incidental damages" under the UCC definition.  However, keeping in mind the underlying principle that an aggrieved seller ought to recover only those damages it did not create for itself, the court doubts that Sikorsky is entitled to the costs that resulted from its own decisions about when to resell Helicopter 16.  And ancillary to this point is that it is not even clear which costs Sikorsky claims are incidental were related to updates and obsolescence.

Similarly, the court hesitates to award any costs resulting from Sikorsky's decision to close the facility where it was building the S-92s.  Again, the cost of transporting Helicopter 16 to a new facility is an expense incurred transporting the aircraft for resale, which otherwise would be recoverable as "incidental damages," but it is not clear that the cost resulted *from the breach*.  Those transport costs would not have become necessary but for Sikorsky's own business decisions.

The court therefore concludes that Sikorsky has failed to show that it is entitled to incidental damages on Helicopter 16, either.

In summary, the court concludes that Sikorsky is entitled to lost profit damages in the amount of $7,304,379.00 as to Helicopter 15, and $7,820,471.00 as to Helicopter 16, for a total of $15,124,850.00.

### V.    <u>CONCLUSION</u>

For the foregoing reasons, it hereby is **ORDERED AND ADJUDGED** as follows:

1. The court finds in favor of Sikorsky on its claim for damages and Babcock's counterclaim.

2. The court finds in favor of Babcock on Sikorsky's claim of bad faith.

3. The court awards damages to Sikorsky in the following amounts:

   a. $15,124,850.00 in lost profits.

   b. Prejudgment interest at the statutory rate from October 18, 2018, through one day before judgment enters.

   c. Post-judgment interest at the statutory rate from the date judgment enters until payment is rendered.

4. The Clerk of Court is asked to please enter judgment in accordance with the foregoing and close this case.

**IT IS SO ORDERED** at Hartford, Connecticut, this 30th day of March, 2026.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE